NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0562n.06

No. 10-1956

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Jun 10, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee,* | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| STEPHANIE JOYCE ARZOLA, | ) | |
| | ) | O P I N I O N |
| *Defendant-Appellant.* | ) | |

BEFORE:    BATCHELDER, Chief Circuit Judge; COLE, Circuit Judge; and ROSEN, Chief District Judge.[*]

**ROSEN, Chief District Judge.** Stephanie Joyce Arzola appeals the 97-month sentence imposed on her by the United States District Court for the Western District of Michigan following her plea of guilty to conspiracy to distribute and  possession with intent to distribute fifty grams or more of cocaine base. Arzola claims that the trial court erred when it: (1) denied her a downward adjustment for "Acceptance of Responsibility"; (2) denied a downward adjustment for "Minor Participant"; and (3) imposed a two-level enhancement for "Obstruction of Justice."  For the reasons set forth below, we AFFIRM the district court's judgment.

---

[*]The Honorable Gerald E. Rosen, Chief Judge of the United States District Court for the Eastern District of Michigan, sitting by designation.

## I. FACTUAL BACKGROUND

On May 21, 2009, a Grand Rapids, Michigan Police Department officer received a report regarding possible drug trafficking at 317 Spencer, in Grand Rapids, Michigan. Surveillance was established and trash pulls were conducted on ten occasions between May 29 and August 27, 2009. In these trash pulls, officers found numerous baggies containing marijuana and cocaine remnants, and mail documents addressed to Carl Johnson and Stephanie Arzola. Based on this information, officers obtained a search warrant for the Spencer Street residence.

Prior to the execution of the search warrant, officers observed Johnson and Arzola exit the residence and enter their vehicle, which was parked in a nearby city lot. Another vehicle pulled up next to the car and Johnson was observed completing a suspected drug deal. Johnson then drove out of the parking lot, and shortly thereafter, officers initiated a traffic stop and took Johnson and Arzola into custody. A search of Johnson's person revealed two baggies of cocaine base. At the Kent County Jail a second search of Johnson's person revealed an additional 1.28 grams of cocaine base.

A search of Johnson's vehicle revealed a receipt for a storage locker located at 3700 Millcreek, in Comstock Park, Michigan. A search warrant was obtained for the storage locker and was executed the same day. Upon execution of this warrant, officers found three weapons in the storage locker: a Ruger 9mm caliber semiautomatic pistol with an obliterated

2

serial number, a Ruger .357 caliber revolver, and an antique .32 caliber Smith & Wesson revolver.

The search warrant for 317 Spencer was also executed on the same date. In the main floor bedroom of the Spencer Street residence, on top of the television, officers found a plate bearing several rocks of a substance believed to be cocaine base. The substance was later sent to the Michigan State Police forensic laboratory and tested positive for cocaine base with a total weight of 3.09 grams.

Several pieces of mail and prescription bottles with Arzola's name on them were also found on the television in the bedroom. In a backpack found in the room the officers found a small bag of marijuana, a sifter, a police scanner, and catalogs and mail addressed to Johnson. A digital scale was located in the bottom drawer of the nightstand.

In the living room, on top of the entertainment center, officers found another plate bearing numerous rocks of a substance believed to be cocaine base. Arzola's fingerprint was found on the plate. The substance was sent to the Michigan State Police forensic laboratory and tested positive for cocaine base with a total weight of 98.72 grams.

On September 16, 2009, a grand jury sitting in the Western District of Michigan returned a four-count indictment charging Arzola and Johnson with drug trafficking and firearms crimes. Count One charged both Arzola and Johnson with conspiring to distribute fifty grams or more of cocaine base in violation of 21 U.S.C. §§ 846 and 841(a)(1). Count Three charged them with possession with intent to distribute fifty grams or more of cocaine

base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii). The remaining counts, Counts Two and Four, charged Johnson only with possession with intent to distribute crack cocaine and with being a felon-in-possession of firearms.

Arzola, who had been initially arrested by state authorities, was subsequently arrested on the federal charges and arraigned on September 18, 2009. She was remanded to federal custody that day. On September 23, 2009, she was released on a $5,000 appearance bond.

**The Government's Offer and Subsequent Withdrawal of a Plea Agreement**

On December 21, 2009, a Superseding Felony Information was filed in the United States District Court for the Western District of Michigan charging Arzola with maintaining a drug house in violation of 21 U.S.C. § 856(a)(1). Arzola agreed to plead guilty to the superseding information in lieu of the original two counts alleged against her in the indictment. The plea agreement, however, was contingent upon Arzola's cooperating with the Government by providing a truthful proffer.

The next day, December 22, 2009, Arzola's bond was revoked because she violated the conditions of her bond by using cocaine during the time she was released on bond, and by failing to appear for drug testing on two separate occasions. Later that same day, December 22, 2009, the government withdrew its proposed plea agreement because Arzola had failed at her attempt at a truthful proffer. The failed proffer arose out of the Government's knowledge that on September 3, 2009, Arzola's first day in custody following her arrest by state authorities, Arzola telephoned a man by the name of "Nitro" from the Kent

4

County Jail. The Government had knowledge that "Nitro" is Harry Johnson, Carl Johnson's brother, and suspected that Harry was a supplier of cocaine and was also involved in the alleged conspiracy. However, at her proffer interview, Arzola denied that "Nitro" was, in fact, Harry Johnson.

As a result of the Government's withdrawal of its plea agreement, on January 5, 2010, Arzola pled guilty to Counts 1 and 3 in the original indictment, without a plea agreement. During the plea hearing, Arzola admitted that she allowed Carl Johnson to store drugs at, and sell drugs from, her home. Arzola also admitted that she benefitted from the money that Carl Johnson made from the sale of drugs, which was used to pay her rent and to purchase other things she wanted or needed.

**Calculation of Defendant's Guideline Sentence**

On February 11, 2010, Arzola participated in a presentence interview. Arzola again admitted that Carl Johnson used her home to sell drugs. Arzola admitted that from June 2009 until her arrest in September 2009, she allowed Carl Johnson to continue his drug dealing activities and she also admitted that she assisted him in these drug activities. Also during the interview, Arzola acknowledged that her actions were "terrible and wrong," and she apologized for her behavior.

Despite these admissions, the presentence investigator determined that Arzola did not qualify for an offense level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 because Arzola continued to use cocaine while on pretrial release, conduct deemed

5

inconsistent with acceptance of responsibility. However, the presentence investigator recommended a two-level reduction for her role as a "minor participant" in the charged crimes pursuant to U.S.S.G § 3B1.2(b) because she appeared to be less culpable in the offense than her co-defendant. The presentence report also indicated that Arzola could qualify for an additional two-level decrease under the "safety valve" provision set forth in U.S.S.G §5C1.2(a) if she were to truthfully provide the Government all information concerning the offense prior to her sentencing.

The Presentence Report set Arzola's criminal history at a Category I based on her criminal history report. Based on Arzola's drug quantity of 103.09 grams of cocaine base, Arzola's base offense level was determined to be 30; with the two-level minor role adjustment, her total offense level was 28.

Relying on Arzola's offense level of 28 and a criminal history category of I, the guideline range for imprisonment was 78 to 97 months. However, because Arzola was convicted of drug trafficking under 21 U.S.C. § 841(b)(1)(A)(iii), she was subject to that statute's 120-month mandatory minimum sentence. Accordingly, 120 months became Arzola's guideline sentence pursuant to U.S.S.G. § 5G1.1(b).

**Defendant's Second Proffer**

After her plea but prior to sentencing, on April 21, 2010, Arzola participated in a second proffer interview. During this interview, Arzola truthfully proffered information concerning Carl Johnson and Harry "Nitro" Johnson and her involvement with them in the

alleged drug conspiracy. Her proffer provided the Government with sufficient information to effectuate a search warrant on Harry Johnson's residence. The search was executed on June 4, 2010, however, no drugs were found. Still, the Government considered the proffer valid and did not dispute its legitimacy.

**Defendant's Communications with the Johnson Brothers**

A sentencing hearing was thereafter convened on April 29, 2010, but was adjourned at the Government's request because it had learned that Arzola had been in contact with Carl Johnson and, indirectly, with Harry Johnson. Specifically, the Government had discovered that following the revocation of her bond, Arzola had engaged in telephone calls and visits with family members, which were recorded pursuant to the county jail's normal procedures. A CD-ROM of recordings was submitted to, and reviewed by, the district court prior to the sentencing hearing. In light of the foregoing, the district court adjourned the sentencing hearing, and in a Minute Order ordered additional briefing from the parties to address whether Defendant Arzola was safety-valve eligible and whether she should receive a two-level enhancement for obstruction of justice, putting the parties on notice that safety-valve credit and obstruction would be at issue at the sentencing hearing, in addition to all other matters that the parties or the PSR had raised.

The particular recorded conversations giving rise to the adjournment of the sentencing hearing and the district court's Minute Order occurred between April 16, 2010, and April 25,

2010, leading up to and following Arzola's April 21, 2010 proffer. These recordings established that Defendant had remained in continuous contact with the Johnson brothers.

For example, in an April 16, 2010, call to her mother, Arzola had asked her mother for letters that Carl Johnson sent to Arzola through Arzola's mother. When Arzola's mother advised her to terminate contact with Carl Johnson, Arzola disagreed and said, "I don't care." Sentencing Tr. at 21. Later in that conversation, Arzola stated that she expected a visit from "Nitro" on April 18. Other calls referenced Arzola's anticipation of the intended visit from Nitro, and the fact that he ended up not visiting. When Nitro did not visit, Arzola asked her mother to deliver a message to him; her mother indicated that the message had already been delivered. Thereafter, Arzola directed her mother to ask Nitro to put money into her jail account. Arzola made a similar statement in an April 25 conversation with her parents at the jail, after her April 21 proffer. Early in the conversation, Arzola referenced the fact that she had disclosed Harry Johnson's criminal involvement; later, she told her mother that if "he" comes, "he" might put money in her jail account. In later conversations on May 6 and May 9, 2010, Arzola asked for pictures of Carl Johnson and expressed a desire to contact Harry Johnson, ignoring her parents' pleas that she terminate her association with the Johnson brothers.

In addition to the recorded conversations, during the June 4, 2010 search of Harry Johnson's home, the police had found a one-page letter that documented that further communication had occurred among Harry, Carl, and Arzola. The letter, dated April 17,

8

2010, was addressed to "Bro" and appears to be from Carl Johnson to his brother, Harry. The letter describes how the writer (presumably Carl) had "been sending messages back and forth to steph [sic; Stephanie] thru trusties [sic] and she said that they want her to say who she was talking to on the phone and they want to know if they [sic] was doing business with me." *Id.* at 22. *See also,* Exhibit 1 to Government's 5/20/10 Sentencing Memormandum. The letter also says, "I'm worried about you and stehpanie [sic]." *Id.* Finally, the writer warned, "Stay Low Key!!!" *Id.*

**Sentencing**

On July 16, 2010, the district court re-convened the sentencing hearing. At this hearing, although the Government agreed with defense counsel that Arzola technically met the criteria for safety-valve eligibility, given that she had finally, prior to the sentencing hearing, provided information concerning her offense, it argued that the court should impose an enhancement for obstruction of justice, and deny downward departure for acceptance of responsibility and mitigating role. As summarized by the district court, the parties' positions at sentencing were as follows:

> [T]he government's basic theory is that what the evidence. . . shows [is] that Ms. Arzola, for whatever reason, has essentially been a partner all along with at least Carl Johnson, and I think the government's theory would be with Harry Johnson as well, . . . and that partnership has continued even into her custodial setting to the point where although she eventually proffered truthfully, she did so only after arranging, perhaps through indirect means, to tip off Harry Johnson that the proffer was coming. And the government's at least suggesting that a motive would be continued financial gain in the form of dollars contributed from Nitro or Harry into the prison account thereby continuing the fruits of the criminal enterprise.

9

* * *

> The defense theory, on the other hand, is Ms. Arzola has been at most a reluctant participant all along on the fringe of the criminal activity. The original sentencing memorandum in fact almost portrayed her as explicitly a victim. . . a victim of manipulative, perhaps even abusive men. But that seems not borne out, certainly to the extent of abuse. . . .

> But at least the point that continues to be a defense argument is [that] Ms. Arzola is so physically and psychologically limited, whether from drug abuse, low average intelligence, or some combination, that she's done the best she can when it comes to acceptance, that she certainly didn't form an intent to obstruct, and that all things considered compared to the other participants she ought to be treated as a minor participant.

Sentencing Tr., pp. 58-59.

Ultimately, after reviewing the record, the district court found that "by a preponderance of the evidence the government theory carries the day." *Id.* at 59. The court found that while the record evidence showed that Arzola maintained a significant emotional attachment, at least for Carl Johnson, the record did not bear out any kind of physical or even emotional coercion. In particular, the court explained that the recordings of Arzola's jailhouse conversations undermined her counsel's claim that her actions could be based on emotional or some other kind of coercion:

> I see no warrant in the record to support or to suggest that Ms. Arzola's participation in any kind of a relationship with Mr. Johnson, Carl Johnson, was anything but voluntary. It might have been misguided, it surely seems to be misguided from my perspective, but that's a whole different question, and that's one she's going to have to get a handle on. But from a legal perspective, I see no suggestion in this record that would support the idea that she's anything less than a full and voluntary participant.

*Id.* at 60.

10

The court also acknowledged that Arzola had a history of drug and alcohol dependence, but observed that she had been sober for the previous seven months that she had spent in custody and noted that her psychological evaluation showed no significant psychopathology.

The court further observed that, by a preponderance of the evidence, the record showed that Arzola worked with Carl Johnson to attempt, and perhaps succeeded, in tipping off Harry "Nitro" Johnson, regarding her upcoming April 21, 2010 proffer:

> The tape recordings are all by themselves, each one in isolation, I think explicable. . . , but when you put them all together and when you add up the letter that [the Government] attached to [its] papers, the so-called Bro letter from Carl Johnson to his brother, I think certainly the most reasonable. . . conclusion here is that Stephanie Arzola and Carl Johnson continued to work to get information to at least one person on the outside, namely, Harry, about what was going on, about what the agents were looking for, and about what Ms. Arzola was going to [be] called upon to say.

*Id.* at 61.

The district court then applied the factual findings gathered at the hearing to the guideline issues in dispute. First, the court denied a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. While the court acknowledged that Arzola's pleading guilty in a timely fashion was a factor to be given consideration, the court found that her breach of bond conditions, her series of false, then reluctant proffers, and the record evidence of no termination or withdrawal from criminal conduct or associations, weighed against a finding of acceptance of responsibility.

11

Second, the court denied a reduction for being a minor participant under U.S.S.G. §

3B1.2, finding from a preponderance of the record evidence that Arzola's role was "one of

partner more than fringe participant." *Id*. at 67. Third, the court imposed a two-level

enhancement for obstruction of justice under U.S.S.G. § 3C1.1, explaining,

> The cases are clear that if you tip somebody off who is under investigation,
> materiality isn't decisive one way or the other. If you're attempting to do that,
> or if you succeed in doing it, the award of two points against you is
> appropriate. It's not the same thing as concluding there was actual obstruction
> of justice within the meaning of a new criminal indictment or criminal charge,
> but it does mean that said I believe Ms. Arzola was willfully obstructing or
> impeding the administration of justice with respect to the investigation. . . .
> And, I think that, as I indicated earlier, and for the reasons I indicated earlier,
> there was an effort certainly, possibly success, in tipping off Nitro or Harry,
> and I think there was also by a preponderance of the evidence an expectation
> of some kind of financial consideration for it.

*Id.* at 68-69.

Nonetheless, the court, albeit somewhat reluctantly, found Arzola eligible for "safety

valve," which released the 10-year statutory mandatory minimum and reduced Arzola's

offense level by two levels. After these adjustments, the district court determined that

Arzola's offense level was 30 (base offense level of 30, plus two levels for obstruction, less

two levels for safety valve), and her criminal history category was I, resulting in an advisory

guideline range of 97-121 months. The court then considered the factors under 18 U.S.C.

§ 3553(a) but ultimately determined that the aggravating factors noted above militated

against a downward variance under a § 3553 analysis. Therefore, the court imposed a

sentence of 97 months, which was the bottom of the advisory guideline range.

12

Arzola now appeals her sentence, contending that the district court erred in calculating the guidelines by refusing to grant a three-level reduction in her offense level for acceptance of responsibility and early plea pursuant to U.S.S.G. § 3E1.1; in denying her a downward adjustment as a "minor participant" under U.S.S.G. § 3B1.2; and in assessing a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1.

## II. <u>DISCUSSION</u>

### A. STANDARD OF REVIEW

A criminal sentence is reviewed for reasonableness. *See United States v. Phinazee*, 515 F.3d 511, 514 (6th Cir. 2008) (citing *United States v. Booker,* 543 U.S. 220, 260-62 (2005)). We evaluate the reasonableness of a sentence under an abuse-of-discretion standard of review. *Id.* (citing *Gall v. United States*, 552 U.S. 38, 46, (2007)). There are two components to this reasonableness review: procedural reasonableness and substantive reasonableness. *United States v. Benson*, 591 F.3d 491, 500 (6th Cir. 2010). The procedural reasonableness of a sentence is determined by the absence of a "'significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.'" *United States v. Johnson*, 640 F.3d 195, 201–02 (6th Cir. 2011) (quoting *Gall*, 552 U.S. at 51). In reviewing a sentencing calculation for procedural reasonableness, findings of fact made by

13

the district court for sentencing are reviewed for clear error. *United States v. Groenendal*, 557 F.3d 419, 422 (6th Cir. 2009) (citing *United States v. Galloway*, 439 F.3d 320, 322 (6th Cir. 2006).

"If the district court's sentencing decision is procedurally sound, we must 'then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard, taking into account the totality of the circumstances. . . .'" *United States v. Erpenbeck*, 532 F.3d 423, 430 (6th Cir. 2008) (quoting *Gall*, 552 U.S. at 51 (edits omitted)). "A sentence may be substantively unreasonable if the district court select[s] the sentence arbitrarily, bas[es] the sentence on impermissible factors, fail[s] to consider pertinent § 3553(a) factors or giv(es) an unreasonable amount of weight to any pertinent factor." *United States v. Vowell*, 516 F.3d 503, 510 (6th Cir. 2008) (internal quotation marks and citations omitted). However, a sentence within the advisory guideline range is given a "rebuttable presumption of substantive reasonableness." *Erpenbeck*, 532 F.3d at 430.

**B.     THE DISTRICT COURT DID NOT ERR IN REFUSING TO ALLOW A REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY AND EARLY PLEA**

The sentencing guidelines provide for a two-level reduction in offense level if the defendant "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). A defendant bears the burden of proving his or her acceptance of responsibility by a preponderance of the evidence. *United States v. Bacon*, 617 F.3d 452, 458 (6th Cir. 2010). Among the considerations a court may take into account in determining whether a

14

defendant qualifies for the acceptance-of-responsibility reduction are: (1) "truthfully admitting the conduct comprising the offense"; (2) "voluntary termination or withdrawal from criminal conduct or associations"; (3) "post-offense rehabilitative efforts (e.g. counseling or drug treatment)"; and (4) "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." *See* U.S.S.G. § 3E1.1, cmt. n. 1. The district court is to make an acceptance-of-responsibility determination based upon the facts presented, and the district court's determination "'is entitled to great deference on review'." *United States v. Webb*, 335 F.3d 534, 538 (6th Cir. 2003) (quoting U.S.S.G. § 3E1.1 cmt. n. 5 (2000)).

Arzola claims that the district court erred in denying her a downward adjustment for acceptance of responsibility and early plea because "it is clearly established that [she admitted] to her wrongdoing." In support of this contention, Arzola points out that she: (1) entered a guilty plea on January 5, 2010; (2) informed the district court that she allowed Mr. Johnson to use her home to store his drugs; (3) admitted that she had constructive possession of crack cocaine in her home on September 23, 2009; (4) provided a statement conveying all material information known to her; and (5) apologized to the district court for her actions during her sentencing hearing.

The entry of a guilty plea, however, does not obligate the court to find that an acceptance-of-responsibility reduction is appropriate. *Webb, supra*. Although entry of a guilty plea "combined with truthfully admitting the conduct comprising the offense of

15

conviction" can be evidence of acceptance of responsibility, "this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n. 3.

The district court here after conducting a very thorough review of the record found that the totality of the evidence of record weighed against granting a reduction for acceptance of responsibility. The court pointed to three particular factors that led to this conclusion. First, the court noted Arzola's violation of the terms of her bond by using drugs. Second, the court pointed to the "series of first false and then reluctant proffers" before Arzola finally gave a truthful statement. Sentencing Tr. at 66. Lastly, the court was persuaded that a reduction was not warranted because "there's clearly not been a termination or withdrawal" from criminal conduct or associations, *id*. at 67, pointing to Arzola's continued ongoing relationship with Carl Johnson and her efforts to tip off Harry "Nitro" Johnson.

The reasons that the district court outlined were justification for denying a reduction for acceptance of responsibility. For instance, we have previously affirmed a denial of an acceptance-of-responsibility reduction where a defendant used drugs while on bond. *See, e.g., United States v. Humphreys*, 108 F. App'x 329, 330 (6th Cir. 2004). We have also found a reduction unwarranted where a defendant failed to terminate criminal associations and attempted to subvert related criminal proceedings. *United States v. Maxwell*, 233 F. App'x 433, 436 (6th Cir. 2007). Additionally, we have upheld a denial of acceptance-of-responsibility adjustment where a defendant did not "timely correct his 'earlier false

16

statements' to [his] probation officer." *United States v. Sullivan*, 134 F. App'x 77, 79 (6th Cir. 2005).

Furthermore, "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." *See* U.S.S.G. § 3E1.1 cmt. n. 4. We have, accordingly, found no error in the denial of an acceptance-of-responsibility adjustment where the defendant is properly assessed an obstruction of justice enhancement. *See e.g., United States v. Wilson*, 197 F.3d 782, 787 (6th Cir. 1999).

Based upon the foregoing, we hold that the district court did not err in denying Arzola's request for a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). It follows that the court also did not err in denying Arzola a one-point reduction for "early plea" pursuant to U.S.S.G. § 3E1.1(b) because subsection (b) may only be applied "[i]f the defendant qualifies for a decrease under subsection (a)."

## C.  THE DISTRICT COURT PROPERLY DETERMINED THAT ARZOLA WAS NOT A "MINOR PARTICIPANT"

Arzola also argues that she should have been granted a two-level reduction for being a minor participant in this case because she was less culpable than her co-defendant, Carl Johnson, and was merely a "subordinate, passive participant, who did what she was told."

U.S.S.G. § 3B1.2 allows a sentencing court to grant a two-, three-, or four-level reduction to a defendant who is "substantially less culpable than the average participant." U.S.S.G. § 3B1.2 cmt. n. 3(A). Four-level reductions apply to "minimal participants," "who

17

are plainly among the least culpable of those involved in the conduct of a group," as demonstrated by their "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others," *id*. cmt. n. 4; two-level adjustments apply to "minor participants," "who [are] less culpable than most other participants, but whose role could not be described as minimal," *id*. cmt. n. 5; and three-level reductions are appropriate for cases "falling between" the two categories, *id*.

A defendant must prove entitlement to a minor-role reduction by a preponderance of the evidence. *See United States v. Searan*, 259 F.3d 434, 447 (6th Cir. 2001). The culpability determination required for application of a mitigating role reduction is "heavily dependent upon the facts," U.S.S.G. § 3B1.2, cmt. n. 3(C), and this court "reviews for clear error the district court's findings of fact regarding whether a defendant is entitled to such reduction." *Searan,* 259 F.3d at 447. A factual decision is clearly erroneous when "'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Russell*, 156 F.3d 687, 690 (6th Cir. 1998) (quoting *United States v. U.S. Gypsum Co*., 333 U.S. 364, 365 (1948)); *see also United States v. Phibbs*, 999 F.2d 1053, 1075 (6th Cir. 1993) (To be clearly erroneous, "a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." (citations omitted)). "On the other hand, if a district court's account of the evidence is plausible in light of the record viewed in its entirety, the reviewing court 'may not reverse it even though

18

convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *United States v. Ables*, 167 F.3d 1021, 1035 (6th Cir. 1999) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985)).

In denying Arzola's request for a mitigating-role reduction in this case, though the district court acknowledged that the Presentence Investigator and the Government had originally acceded to the reduction, the court explained that, as the facts and events of the case unfolded, that view changed. The court agreed with the Government that Arzola was not a minor participant and thus was not entitled to a two-point reduction on that basis, explaining:

> In this case the evidence has, I think, based on what we have seen here in this sentencing record demonstrated that Ms. Arzola's role has been one of partner more than fringe participant. The partnership doesn't mean she was an equal partner, but it does mean, I think, that at least by a preponderance she certainly had knowledge of the overall scope of activities that were part of this conspiracy and part of the wrongdoing.
>
> She was, I think, a willing participant in that, [she] was certainly present at some drug transactions, and I think it's a reasonable inference that although she may not have done everything or been a full partner, that she is not at least in that substantially less-culpable role that the guidelines would call for if I'm going to mitigate or reduce her responsibility. Particularly in light of the Court's findings regarding ongoing association as I outlined earlier, it seems to me she continues to be part of the criminal association.

Sentencing Tr. pp. 67-68.

As evidence that she was a minor participant, Arzola points out that she had no connection with the storage locker in which guns were found, and she further notes that on the day of her arrest it was her co-defendant, Carl Johnson, not she, who was observed

19

making a drug transaction. She further claims that she merely allowed Carl Johnson to use her home as a base for his drug distribution operation, and although she acknowledges her constructive possession of the narcotics found in her home and her general knowledge of Johnson's drug dealings, she points out she only admitted to selling drugs for Johnson on one occasion. Therefore, she contends she should be viewed as nothing more than a minor participant in the drug distribution operation.

Arzola's contention is not supported by the case law. We have upheld the denial of a minor-role reduction when the evidence showed that the defendant "housed" the drugs, made only a "few" sales, and personally used the drugs. *See United States v. Hendrick*, 100 F. App'x 533, 534-35 (6th Cir. 2004). *See also United States v. Corral*, 324 F.3d 866, 874 (7th Cir. 2003). Furthermore, even if it were arguable whether Arzola was substantially less culpable than "the average participant" in Johnson's drug distribution operation, "[w]here there are two permissible views of the [defendant's role], the factfinder's choice between them cannot be clearly erroneous." *United States v. Tilford*, 224 F.3d 865, 868 (6th Cir. 2000) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985)).

As indicated above, Defendant here admitted her constructive possession of the narcotics found in her home and admitted that she let Johnson use her home as the base for his drug distribution business. She further admitted to having, at least on one occasion, sold drugs for Johnson. She also admitted to having enjoyed the fruits of Johnson's -- and her own -- labors and having used monies received from the sales to pay for her rent and various

20

personal items. This evidence provided sufficient justification for the district court's denial of a two-level minor-role reduction.

**D. THE DISTRICT COURT'S TWO-LEVEL ENHANCEMENT FOR OBSTRUCTION OF JUSTICE WAS PROPER**

We now turn to Arzola's contention that the district court erred in enhancing her sentence based on obstruction of justice. In reviewing a district court's application of the obstruction enhancement under U.S.S.G. § 3C1.1, we review *de novo* the determination that specific conduct constituted obstruction of justice, but will not set aside the district court's factual findings unless clearly erroneous. *United States v. Camejo*, 333 F.3d 669, 674-75 (6th Cir. 2003).

U.S.S.G. § 3C1.1 states:

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

The commentary to this section provides a "non-exhaustive list of examples of the types of conduct to which this adjustment applies," including "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation. . . , *or attempting to do so*." U.S.S.G. § 3C1.1, cmt. n. 4(D) (emphasis added).

21

The district court imposed a two-level enhancement for obstruction of justice after considering witness testimony, viewing the evidence, and listening to counsels' arguments at the sentencing hearing. The court based its conclusion, in particular, on jailhouse recordings that were played during the sentencing hearing and the letter that was obtained during a search of Harry Johnson's residence. The district court found that a preponderance of this record evidence showed that Arzola worked with her co-defendant, Carl Johnson, "to attempt and perhaps succeed in tipping off Harry Johnson, or Nitro, regarding her [then] upcoming proffer." Sentencing Tr. at 61.

The court was particularly persuaded that Arzola had attempted to tip Harry Johnson off after reading the letter found during a search of Harry Johnson's home:

> The letter was pretty explicit. Carl Johnson says,
>    "I've been sending messages back and forth to Steph through trustees."
> And she said that they wanted her to say who she was talking to on the phone and "They want to know if they were doing business with me." That's the language of the letter.
>
>    It goes on to detail some other information, obviously passing information in a way that they thought would be safe and putting Harry on notice as to what was going on. That's one thing.

*Id.* at 61-62.

The court also found persuasive the tape recordings of Arzola's telephone conversations with her parents about an anticipated visit from Harry Johnson and money he would deposit in her prison account:

22

> . . . [T]he tape recordings. . . indicate that Ms. Arzola herself had a very focused intention on wanting to visit in person or at least have a phone contact, but I think a visit is what she was looking for. . . with Harry, with Nitro.
>
> Understandably their ability to communicate was limited. They did what they could. But that to me is an explanation of why Ms. Arzola would want a more direct attempt to talk to Nitro and wanted to give him more information if she could. I think that's an eminently supported conclusion on this record by a preponderance of the evidence.
>
> . . . I listened to the phone calls…Clearly money is a persistent issue . . . she wants Money from Nitro . . .money [was] expected from Nitro because there was ongoing drug activity that had been a part of conspiracy and she wanted, that is Ms. Arzola, wanted to continue to get some of that at least in partial payment for tipping [Nitro] off. . . .

*Id.* at 62-63.

Ms. Arzola argues that the evidence relied upon by the district court was not sufficient to establish obstruction of justice by a preponderance of the evidence. In this regard, she argues that she had no direct contact with Harry Johnson. She also claims that, to the extent the letter from Mr. Johnson references contact with her, those references are to facts she claims would be known to anyone who has any relationship with her. She further points to the absence of evidence in the record suggesting that she directed Carl Johnson to write his brother, Harry, and warn him to "stay low."

In support of her argument, Arzola relies on *United States v. Emmert*, 9 F.3d 699 (8th Cir. 1993). In *Emmert*, the Eighth Circuit determined that comments yelled by a defendant to a witness standing outside the courtroom to "stay strong" and "be quiet" were not significant enough to warrant the application of a two-level enhancement for obstruction of justice.

23

Arzola claims her case is similar in that the words "stay low key" should also not be significant enough to warrant an enhancement for obstruction of justice.

Arzola's reliance on *Emmert* is misplaced. The court's decision in that case was based solely on the comments the defendant yelled out of the courtroom. Here, the district court was presented with much more than just the "stay low key" letter, and the court's determination that Arzola should be assessed a two-level obstruction of justice enhancement in this case was based upon its consideration of *all* of Arzola's actions, including her communications with Carl Johnson and her efforts to contact Harry Johnson through her parents in order to get a "message" to him, not just the advice in the letter to "stay low key." Moreover, "whether a set of facts constitutes obstruction of justice" is the kind of "fact-bound decision" in which "'factual nuance may closely guide the legal decision, with legal results depending heavily upon an understanding of the significance of case-specific details'." *United States v. Jackson-Randolph*, 282 F.3d 369, 389 (6th Cir. 2002) (quoting *Buford v. United States*, 532 U.S. 59, 65 (2001)).

Furthermore, we have previously held that a defendant's attempt to contact those involved in his or her criminal activities or others or to conceal or destroy evidence of such activities amounts to obstruction of justice under U.S.S.G. § 3C1.1. *See, e.g., United States v. Burke*, 345 F.3d 416, 428-31 (6th Cir. 2003) (upholding obstruction of justice enhancement where the defendant, while under criminal investigation involving the unlawful transfer of vehicle identification numbers, called his brother, a co-defendant in the VIN flipping scam, and

24

asked him to move a car with a transferred number so that police would not find it); *United States v. Gauna*, 485 F. App'x 70, 78 (6th Cir. 2012) (district court's finding that a defendant's phone call to a co-defendant was an attempt to tip co-defendants off that police were coming supported obstruction of justice enhancement); *United States v. Swoveland*, 51 F. App'x. 516 (6th Cir. 2002) (sentence enhancement for obstruction of justice held proper where the defendant, after being arrested for producing false identification, made a telephone call to a friend asking that she remove various items of evidence associated with the case); *see also United States v. Cassiliano*, 137 F.3d 742, 746-47 (2d Cir. 1998) (alerting target of investigation with whom the defendant had collaborated warranted § 3C1.1 enhancement); *United States v. Hankins*, 127 F.3d 932, 935 (10th Cir. 1997) (no error in enhancing the sentence of a drug conspiracy defendant who had made a telephone call to his sister instructing her to break into a storage facility where he had large amounts of cash hidden and remove the cash so that it would not be found).

Although the case is admittedly a close one, after applying the foregoing, we hold that the district court did not err in assessing a two-level enhancement for obstruction of justice. The district court determined that the sentencing record showed that Arzola engaged in repetitive attempts to contact Harry Johnson -- personally and through her parents and her co-defendant, Carl Johnson -- and alert him that she was disclosing details concerning the drug conspiracy. The district court's account of the evidence is plausible in light of the record viewed in its entirety. *See United States v. Ables*,167 F.3d at 1035.

25

For all of the foregoing reasons, the judgment of the district court is AFFIRMED.